## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

MFA Enterprises, Inc. d/b/a West Central Agri Services,

Petitioner,

v.

OSHRC, et al.,

Respondents.

**BRIEF OF PETITIONER**
**MFA ENTERPRISES, INC. D/B/A WEST CENTRAL AGRI SERVICES**

Petition for Review of an Order of the
Occupational Safety & Health Review Commission
OSHRC Docket No. 21-0725

**LATHROP GPM LLP**
Richard C. Landon
3100 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 632-3000

**LATHROP GPM LLP**
Tedrick A. Housh III
Ellen Rudolph
2345 Grand Blvd, Suite 2200
Kansas City, MO 64108
Telephone: (816) 460-5642

*Attorneys for MFA Enterprises Inc. d/b/a West Central Agri Services*

## SUMMARY OF THE CASE

This case involves the fall-protection safety standards that apply to employees walking and working atop railcars. On June 21, 2021, OSHA issued a citation to Petitioner MFA Enterprises, Inc. d/b/a West Central Agri Services for a willful violation of failing to use a fall-protection system while performing a railcar loadout. OSHA did not base its citation on the regulation of personal fall protection systems under 29 C.F.R. § 1910.140, but instead based the citation on a general PPE standard under 29 C.F.R. § 1910.132. An ALJ upheld this citation and the "willful" characterization on July 9, 2024, concluding that it fell within a narrow 30-year-old exception to FRA preemption of OSHA's fall-protection standards. This became a final decision of the Commission on August 22, 2024.

Petitioner asks this Court to grant its petition, reverse the Commission's order, and vacate OSHA's June 21, 2021, citation because Petitioner did not have fair notice that OSHA's PPE standard would apply to the conduct at issue. In the alternative, Petitioner asks that the Court reverse the citation's characterization of "willful." Petitioner respectfully requests 15 minutes of oral argument, which will help address questions about the application of the facts in this case to regulatory framework at issue on appeal.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1(a) and Eighth Circuit Rule 26.1A, Petitioner MFA Enterprises, Inc. is a stock corporation that is wholly owned by MFA Inc., which is a wholly member-owned cooperative created under Missouri law. There are no publicly held corporations that own 10% or more of MFA.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ....................................................................i

CORPORATE DISCLOSURE STATEMENT.................................... ii

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF ISSUES .............................................................2

STATEMENT OF THE CASE..........................................................3

    A.    Background of the Conduct at Issue ................................3

    B.    OSHA Citation ................................................................6

    C.    Background of OSHA's Regulatory Authority Over Rolling Stock.................................................................8

    D.    Background of the Miles Memorandum.......................11

    E.    Subsequent OSHA Regulation Related to Rolling Stock............13

SUMMARY OF THE ARGUMENT.................................................17

ARGUMENT.................................................................................19

    I.    Standard of Review ......................................................19

    II.    The ALJ's decision is not in accordance with the law because OSHA has failed to give proper notice that its regulations would govern walking and working on top of railcars ............................................................20

        A.    The Miles Memorandum does not provide fair notice of OSHA's enforcement policy for fall hazards from atop rolling stock..........................22

B.    West Central did not have fair notice that OSHA would regulate fall hazards under § 1910.132 because more recent regulation of fall-hazard systems declined to adopt requirements for rolling stock....................................................................................25

C.    West Central did not have fair notice that OSHA would issue citations under § 1910.132 because the majority of railcar loadout work occurred outside the fall protection system and, therefore, outside the scope of the PPE standard ....................................................29

III.    The ALJ's decision is not in accordance with the law because the record does not show that MFA "willfully" violated fall protection standards....................................................32

A.    The ALJ acknowledged there was no proof of intentional disregard and the record does not support the ALJ's supposition about plain indifference ..............................................................33

B.    West Central's other safety precautions should have been considered "good faith" that mitigates against a "willful" violation ..............................................................37

CONCLUSION .........................................................................................40

CERTIFICATE OF COMPLIANCE......................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJP Constr., Inc. v. Sec'y of Labor,*
  357 F.3d 70 (D.C. Cir. 2004)...........................................................34

*C.N. Flagg & Co., Inc.,*
  2 BL OSHC 1539 (No. 1409, 1975)...............................................38

*Consol. Rail Corp.,* 16 BL OSHC (No. 91-3133, 1993)....................9, 10

*Dakota Underground, Inc. v. Sec'y of Lab.,*
  200 F.3d 564 (8th Cir. 2000)..........................................................38

*Dayton Tire v. Sec'y of Lab.,*
  671 F.3d 1249 (D.C. Cir. 2012)...................................................2, 39

*Echo Powerline, LLC v. OSHRC,*
  968 F.3d 471 (8th Cir. 2020)..........................................................19

*Erickson Air-Crane, Inc.,*
  2012 CCH OSHD ¶ 33199, 2012 WL 762001 (No. 07-0645,
  March 2, 2012).................................................................2, 20, 24

*Fabarc Steel Supply, Inc., Respondent.,*
  2019 CCH OSHD. ¶ 33753, 2019 WL 4786889 (No. 18-1859,
  Aug. 20, 2019) ............................................................2, 27, 28, 29

*Home Rubber Co., Lp,*
  2021 CCH OSHD ¶ 33,853 (No. 17-0138, 2021) ........................33

*Jacobs Field Servs. N. Am., Inc. v. Scalia,*
  960 F.3d 1027 (8th Cir. 2020)....................................................16, 31

*Jim Boyd Constr., Inc.,*
  No. 11-2559, 2016 WL 8201805 (OSHRC, Nov. 16, 2016.) ..........38

*McLaughlin v. Union Oil Co.,*
    869 F.2d 1039 (7th Cir.1989) ............................................................39

*MJP Constr. Co.,*
    19 BNA OSHC 1638 (No. 98-0502, 2001) ....................................34

*New River Electrical Corp. v. OSHRC,*
    25 F.4th 213 (4th Cir. 2022)............................................................20

*Perez v. Loren Cook Co.,*
    803 F.3d 935 (8th Cir. 2015) ..................................................26, 32

*Propellex Corp.,*
    18 BNA OSHC 1677 (No. 96-0265, 1996) ....................................33

*St. Joe Mins. Corp v. OSHRC,*
    647 F.2d 840 (8th Cir. 1981)..............................................2, 32, 35

*United States v. DNRB, Inc.,*
    895 F.3d 1063 (8th Cir. 2018)........................................................33

*Valdak Corp. v. OSHA,*
    73 F.3d 1466 (8th Cir. 1996) ........................................................33

*Western Waterproofing Co. v. Marshall,*
    576 F.2d 139 (8th Cir. 1978)..........................................................35

## Statutes

29 U.S.C. § 653 (b)(1) ............................................................................8

29 U.S.C. § 660................................................................................1, 19

## Other Authorities

29 C.F.R. § 1910(a) .......................................................................13, 23

29 C.F.R. § 1910.5(c)(1).......................................................................26

29 C.F.R. § 1910.132.................................. 6, 7, 16, 17, 25, 26, 27, 28, 29

29 C.F.R. § 1910.132(d)...........................................................6, 7, 12, 40

29 C.F.R. § 1910.133 ................................................................25

29 C.F.R. § 1910.134 ................................................................25

29 C.F.R. § 1910.135 ................................................................25

29 C.F.R. § 1910.136 ................................................................25

29 C.F.R. § 1910.137 ................................................................25

29 C.F.R. § 1910.138 ................................................................25

29 C.F.R. § 1910.140 ........................................16, 25, 26, 27, 29

43 Fed. Reg. 10583 (March 14, 1978) ...............................9, 10, 11

68 Fed. Reg. 23528-01 (May 2, 2003) .............................13, 14, 24

81 Fed. Reg. 82494-01, 82505 (Nov. 18, 2016) ...........15, 16, 28, 37

75 FR 28862-01 ..............................................................14, 23

81 FR at 82510 ................................................................16

# JURISDICTIONAL STATEMENT

The Occupational Safety and Health Review Commission issued a decision on July 9, 2024, in the matter of *Secretary of Labor v. MFA Enterprises Inc. d/b/a West Central Agri Services*, OSHRC Docket No. 21-0725. This decision became final on August 22, 2024, when the Commission declined discretionary review of the ALJ decision.

This Court has jurisdiction pursuant to 29 U.S.C. § 660(a). Petitioner timely filed its Petition for Review with this Court on October 16, 2024. Venue is proper in this Court pursuant to 29 U.S.C. § 660 because the alleged violation occurred within this judicial circuit and Petitioner has its principal office in this judicial circuit.

# STATEMENT OF ISSUES

1.     Did the ALJ properly determine that Petitioner had been given fair notice that OSHA's personal protective equipment standards would regulate fall protection hazards on top of railcars?

Apposite cases:

> *Erickson Air-Crane, Inc.*, 2012 CCH OSHD ¶ 33199, 2012 WL 762001 (No. 07-0645, March 2, 2012).

> *Fabarc Steel Supply, Inc., Respondent.,* 2019 CCH OSHD. ¶ 33753, 2019 WL 4786889 (No. 18-1859, Aug. 20, 2019).

> *Davey Tree Expert Co. & Its Successors, Respondent*, No. 11-2556, 2013 WL 11263360 (CMPAU July 1, 2013).


2.     Did the ALJ properly determine that Petitioner "willfully" violated the personal protective equipment standard under which it was cited?

Apposite cases:

> *St. Joe Mins. Corp v. OSHRC*, 647 F.2d 840 (8th Cir. 1981).

> *Dayton Tire v. Sec'y of Lab.*, 671 F.3d 1249 (D.C. Cir. 2012),

## STATEMENT OF THE CASE

### A.    Background of the Conduct at Issue

Petitioner MFA Enterprises, Inc. d/b/a West Central Agri Services (hereinafter "West Central") is a corporation engaged in bulk farm product warehousing and storage facilities. West Central operates a grain handling facility including a concrete grain elevator in Adrian, Missouri. ADD-02. Shipping grain from the Adrian facility involved "railcar loadout," which is the process by which grain was transferred from storage bins at the grain elevator onto railcars and then shipped to West Central's customers. ADD-03.

Railcar loadout at the Adrian facility involved an employee accessing the top of railcars to open multiple lids through which the grain would be received from grain spouts above. ADD-03. Once the lids were open, another employee would push the railcars into place under the grain spouts with a Trackmobile machine, and the amount of grain transferred was controlled from a scale house adjacent to the tracks. ADD-03. After the railcars were filled and pushed out of the way, an employee would close and seal the lids. ADD-03.

Bill John Umstattd was an experienced elevator operator who was primarily responsible for opening and closing railcar lids during the loadout process. ADD-04. Umstattd typically accessed the tops of railcars either from a scale house walkway or a railcar ladder. ADD-04. Umstattd would walk along a catwalk on the roof of the railcar and open each lid by hand. ADD-04. After all of the lids were opened on one railcar, he would step across to the next railcar and repeat the process until all lids were open. ADD-04. West Central installed a fall protection system in 2016 that suspended I-beams running parallel to the railroad tracks. ADD-05. A trolley ran along each beam and connected to a pulley, body harness, and self-retracting line, which would glide along the beam while the employee moved along the railcars. ADD-05.

In practice, the I-beam fall protection system created various problems for West Central's employees. On the facility's busiest days, West Central would need to fill approximately 20 cars that were lined up at once. [decision at 4.] But the I-beam structure's reach was limited to only three or four railcars and would not allow the operator to walk along all of the railcars that were lined up. ADD-05. West Central employees complained that the system's harness was uncomfortable, the reach of the system was

too short, and the trolley frequently became "gummed up," reducing its efficiency. ADD-05.

Umstattd did not usually use the I-beam fall protection system unless it was wet or windy. ADD-09. Instead, Umstattd preferred to walk atop all of the stationary railcars that were lined up—most of which were outside the I-beam structure and had no fall protection available—and he would open all the lids at once, which helped him complete the task more quickly. ADD-09.

West Central provided a handbook and training to its employees indicating that, if a fall protection system was present, they must use it every time. ADD-06-07. West Central did have a general understanding that fall protection was not required outside the I-beam structure, such as when Umstattd walked atop the railcars lined up beyond the fall protection system. ADD-09. Importantly, West Central instructed its employees to not work atop railcars while they were moving. A-80 (A.R. Vol. 1 at 113); A-120 (A.R. Vol. 1 at 271); A-170 (A.R. Vol. 3 at 746). West Central also implemented a peer-to-peer behavioral-based safety program called SHIELD BBS, which monitors compliance with safety and work policies and provides positive feedback to encourage safe behavior. ADD-07.

## B.     OSHA Citation

On December 31, 2020, there was an explosion at the Adrian facility's concrete grain elevator. ADD-05. The Occupational Safety and Health Administration (OSHA) conducted an investigation of the facility later that afternoon. Although Umstattd did not fall and was not injured, video evidence demonstrated that earlier that morning—before the explosion occurred—he had been standing on the roof of a railcar under the I-beam structure without wearing any fall protection. ADD-05.

On June 21, 2021, OSHA issued a citation alleging one willful violation of § 1910.132(d)(1)(i) for failure to wear personal protective equipment while performing a railcar loadout. ADD-10. The proposed penalty was $136,532, the maximum penalty for a willful violation.

A three-day trial was held before an Administrative Law Judge in Kansas City, Missouri, in April 2023. ADD-02. In his July 9, 2024, decision, the ALJ concluded that the Secretary had established that § 1910.132, which requires an employer to perform a hazard assessment and ensure its employees use the type of PPE identified in that hazard assessment, did

apply to the conduct at issue.[1] ADD-13. While no formal hazard assessment was identified at trial, the ALJ concluded that the fall protection system installed in 2016 was itself evidence of an implied assessment. ADD-13.

The ALJ acknowledged that, for employee safety on rolling stock, such as the railcars at issue in this matter, OSHA's fall-protection regulations under Subpart D were preempted by FRA regulations. ADD-13. The ALJ concluded that West Central nevertheless had fair notice that § 1910.132, OSHA's general PPE regulations under Subpart I, would apply to rolling stock, based on a 30-year old internal memorandum by OSHA's Directorate of Enforcement Programs. ADD-13-19.

The ALJ concluded that West Central violated § 1910.132 because Umstattd was working atop the railcar without using the fall protection system that West Central had installed, exposing him to a fall hazard.

---

[1] In a separate prong of the PPE regulation, it also requires the assessment to be recorded in writing. 29 C.F.R. § 1910.132(d)(2). Although the Citation under 29 C.F.R. § 1910.132(d)(1)(i) is predicated on a written assessment, no written assessment was identified or introduced as evidence in this case. OSHA did not cite West Central for failure to record a written assessment.

ADD-19. The ALJ also upheld the violation as "willful,"[2] and slightly reduced the penalty to $ 122,878.80 based on the size of the employer. ADD-32.

## C. Background of OSHA's Regulatory Authority Over Rolling Stock

As noted by the ALJ, Congress has limited OSHA's regulation of workplaces for which it lacks the expertise of another federal regulatory agency. Section 4(b)(1) of the Occupational Safety and Health Act of 1970, provides: "Nothing in this Act shall apply to working conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653 (b)(1).

The Federal Railroad Administration (FRA) has promulgated regulations that apply to the working/walking surfaces atop rail cars. In considering the FRA's and OSHA's respective regulatory purview, the FRA

---

[2] The ALJ's decision stated in its Penalty section that, "[t]he Court notes that since the violation has been recharacterized as Serious rather than Willful, the maximum penalty that may be assessed changes." ADD-29. It is not clear why, having upheld the violation as "willful," the ALJ went on to state that the violation was recharacterized as Serious, as West Central had urged the ALJ to do.

issued a Policy Statement in 1978 that rejected the primary application of OSHA regulations to "railroad operations," defined broadly by the FRA as "the movement of equipment over the rails." *See* Railroad Occupational Safety and Health Standards; Termination, 43 Fed. Reg. 10583 (March 14, 1978); ADD-14.

OSHA recognizes FRA as the primary regulator of railroad operations. This means that FRA regulations will control, even if they do not cover every facet of worker safety to which OSHA would normally apply. The OSHRC agrees that "the FRA need not track OSHA's standards in every facet of hazard or surroundings—work location or equipment—in order to have regulations capable of preempting those of OSHA." *Consol. Rail Corp.*, 16 BL OSHC (No. 91-3133, 1993).

In the view of the FRA, the OSHA jurisdiction does not extend to the design and use of rolling or moving stock such as railcars. In explaining why it is the primary regulator of railroad operations—such as work performed atop railcars—the FRA noted that OSHA's walking-working surfaces regulations in Subpart D "deal with such matters as ladders, stairways, platforms, scaffolds and floor openings" generally found in "offices, shops and other fixed workplaces." 43 Fed. Reg. at 10587.

The FRA made clear that OSHA cannot regulate work atop rolling stock using Subpart D, stating it "would not apply with respect to the design of locomotives and other rolling equipment used on a railroad, since working conditions related to such surfaces are regulated by FRA as major aspects of railroad operations." 43 Fed. Reg. at 10587. In other words, if working conditions related to the surfaces of rolling stock are "major aspects of railroad operations," then the FRA, not OSHA, is the proper regulator.

Neither OSHRC nor OSHA dispute that work atop railcars is a working condition unique to railroad operations. The OSHRC has acknowledged the very same language from the 1978 FRA Policy Statement. *Consol. Rail Corp.*, 16 OSHC at 1033 (quoting 43 Fed. Reg. at 10587). The 1978 FRA Policy Statement did not explicitly address OSHA's regulatory authority over personal protective equipment (PPE) under Subpart I. ADD-14. FRA regulations do, however, still limit the application of OSHA's PPE requirements. For example, OSHA could not prescribe attire designed for mandatory use of an employee when uncoupling railcars. *See* A-184-85 (A.R. Vol. 4, Ex. J-1).

The FRA only allows OSHA PPE requirements for "hazards growing out of railroad operations"—not for the railroad operations themselves. 43 Fed. Reg. at 10588. These ancillary hazards are different from actual railcar operations. For example, the FRA foresaw that OSHA might be able to require PPE for "persons working along the railroad right-of-way," but cautioned that the PPE must not aggravate the hazards "by obscuring vision or muffling the noise of approaching trains." (*Id.*) This stated example demonstrates that OSHA's PPE requirements are typically intended for work that does not occur on top of railcars.

### D.   Background of the Miles Memorandum

In light of the preemption issues between FRA and OSHA, the Secretary has not engaged in rulemaking to regulate workers atop railcars. Instead, OSHA issued a 1996 internal agency memorandum by then-Director of OSHA's Directorate of Enforcement Programs, John B. Miles, Jr., to "clarify OSHA's enforcement policy relating to fall hazards from the top of 'rolling stock' such as rail tank or hopper cars and tank or hopper truck or trailers." ADD-15; A-184-85 (A.R. Vol. 4, Ex. J-1). (Hereinafter, the "Miles Memorandum.")

Entitled, "Enforcement of Fall Protection on Moving Stock," the Miles Memorandum confirmed that OHSA would not enforce fall protection on moving stock, explicitly excluding rolling stock from the coverage of the new proposed fall protection standard under Subpart D. A-184-85. The Miles Memorandum also directed OSHA inspectors *not* to cite employers for fall hazards atop rolling stock under the PPE standard in Subpart I, acknowledging that "it would not be appropriate to use the personal protection equipment standard, 29 C.F.R. § 1910.132(d), to cite exposure to fall hazards from the tops of rolling stock." A-185.

Rather than end on a clear prohibition against citing fall hazards atop rolling stock, the Miles Memorandum qualified this prohibition as applying "unless employees are working atop stock that is positioned inside of or contiguous to a building or other structure where the installation of fall protection is feasible." A-185 (A.R. Vol. 4, Ex. J-1).

The Miles Memorandum provided inspectors with no criteria under which they could decide "where the installation of fall protection" would be "feasible." The Secretary has not provided any further clarity on the Miles Memorandum, either by confirming the role of the PPE standard for

rolling stock or identifying any bounds for when installation of fall protection would or would not be feasible.

### E.    Subsequent OSHA Regulation Related to Rolling Stock

In 2002, Richard Fairfax, then Director of OSHA's Directorate of Enforcement Programs, issued a standards interpretation letter noting that OSHA was developing a compliance directive to provide enforcement guidance for rolling stock hazards and walking/working surfaces not otherwise addressed in general industry. *See* Occupational Safety and Health Administration, Archived Standard Interpretation, 29 C.F.R. § 1910(a): Fall protection requirements for commercial motor vehicles (Mar. 4, 2002), https://www.osha.gov/laws-regs/standardinterpretations/2002-03-04-1. The promised compliance, however, never materialized.

In 2003, OSHA issued a Notice of Reopening of the Rulemaking Record and requested additional comment on whether railcars "should be covered or excluded from Subpart D." Walking and Working Surfaces; Personal Protective Equipment (Fall Protection Systems), 68 Fed. Reg. 23528-01 (May 2, 2003). OSHA described the Miles Memorandum as having been issued to its Regional Administrators "[i]n anticipation of final revised rule." *Id.* It expressly asked, "Should OSHA exclude rolling stock

and self-propelled motorized mobile equipment from coverage under subpart D?" *Id.*

The notice of rulemaking in 2003—and the express question of whether rolling stock should be excluded from standards for walking and working surfaces—indicates that OSHA considered the earlier Miles Memorandum to be a Director's interim suggestion that did not have the same impact as a final revised rule that was intended to settle the question of fall protection required atop railcars.

In 2010, OSHA issued Notice of Proposed Rule seeking comment on the unsettled issues of how to define "rolling stock" and, again, whether Subpart D should apply to railcars. Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems, 75 FR 28862-01 (proposed May 24, 2010). OSHA itself conceded that the Miles Memorandum did not provide clear enforcement guidance, which had required the 2003 Notice of Reopening. 75 FR at 28867 ("The memorandum did not result in clear direction to the public or to OSHA's field staff. As a result, OSHA raised the issue of fall protection on rolling stock and motor vehicles in a separate Federal Register notice—the 2003 Reopening Notice.").

In 2016, OSHA finally issued a Final Rule, found at 81 Fed. Reg. 82494 (Nov. 18, 2016), but still issued no standards regarding fall protection for workers atop railcars. OSHA acknowledged the jurisdictional issues in regulating "railroad operations," stating that the American Railroad Association had told OSHA to defer to the FRA because of "special concerns, such as . . . the unique configuration of rolling stock" and because the FRA, not OSHA, had the "expertise to determine when regulations [on rolling stock] are necessary and the content of those regulations." 81 Fed. Reg. at 82509.

By 2016, OSHA still lacked any consensus from stakeholders on its regulation of workers atop railcars. Some stakeholders noted that only a few workers are atop railcars:

> Stakeholders who said workers climb on rolling stock and motor vehicles stressed the number of workers doing so is very low. Conoco Phillips Company said, "[T]he number of employees required to work atop rolling stock is minimal (<1%)" (Ex. OSHA-S029-2006-0662-0320; see also Exs. 148 (NGFA—"At best, a small percentage of the employees … are exposed); 181 (American Truck Dealers/National Automobile Dealers Association (ATD/NADA)—less than 10 percent of employees)).

Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems), 81 Fed. Reg. 82494-01, 82505 (Nov. 18, 2016).

In the 2016 Final Rule, OSHA also referred to stakeholder comments that there were effective measures (apart from conventional fall protection line and cable systems) already in place to protect workers on rolling stock. Among these effective measures were initial, periodic, and remedial training, loading/unloading trailers from the ground (e.g., bottom-loading tankers, ground-level controls) and prohibiting workers from being on moving rolling stock. *See* 81 Fed. Reg. at 82506.[3]

Having failed to clarify the application of its fall protection standards to workers atop railcars, OSHA explained in the 2016 Final Rule that it was adding new fall protection requirements in Subpart I, at 29 C.F.R. § 1910.140, to harmonize general industry and existing construction walking-working fall protection standards. *See* 81 FR at 82510.

---

[3] The Eighth Circuit has noted that such industry practices are particularly relevant with respect to the general PPE requirements in § 1910.132, which "is a broadly worded performance standard that applies to countless conditions and circumstances." *Jacobs Field Servs. N. Am., Inc. v. Scalia*, 960 F.3d 1027, 1034 (8th Cir. 2020). OSHA rulemaking reflects no industry consensus to support its regulation of workers atop railcars.

## SUMMARY OF THE ARGUMENT

OSHA has long recognized that, because of preemption by the FRA, OSHA's fall-protection standards would not apply to work atop railcars. Nevertheless, OSHA issued a citation to West Central for a willful violation because it said West Central failed to use a fall-protection system while performing a railcar loadout. Although OSHA concedes that in general, its fall-protection standards do not apply to the conduct at issue in this case, the citation was based on a narrow and vaguely stated exception to FRA preemption that was stated in an internal OSHA memorandum and never clarified or expressly adopted by the Secretary during subsequent rulemaking.

The Court should reverse the ALJ's decision and vacate the citation in this case because West Central never had fair notice that OSHA's general PPE standards in 29 C.F.R. § 1910.132 would apply to walking and working atop railcars, which is the conduct at issue in this case. The Miles Memorandum stated that it would be inappropriate for OSHA to apply its general PPE standards unless rolling stock is "positioned inside of or contiguous to a building or other structure where the installation of fall protection is feasible." But OSHA has provided no guidance as to when or

how this "feasibility" standard would apply, and the Secretary has admitted that this explanation did not result in clear direction to the public or OSHA's field staff.

Not only did the vague articulation of the Miles Memorandum deprive West Central of fair notice, but the Secretary has muddied the waters even further by announcing subsequent rulemaking on this issue while still failing to officially adopt or clarify the supposed exception in the Miles Memorandum. Although OSHA has developed specific fall-protection standards in 2017—which do not regulate rolling stock—OSHA nevertheless cited West Central under the earlier, general PPE standard for failure to use a fall-protection system. Further confusing the matter is the fact that OSHA concedes that this general standard would not have applied to any work that West Central's employees often performed atop railcars outside the I-beam fall-protection structure.

Finally, even if the Court does not vacate the citation itself, the ALJ's decision to uphold the "willful" characterization should be reversed. The ALJ acknowledged that West Central did not have actual awareness that its acts were unlawful, but the ALJ's speculation that West Central would not have cared even if it had known cannot be squared with the vague and

inconsistent history of OSHA's fall protection regulations. The ALJ's

willfulness determination appears based entirely on West Central's

knowledge of the hazard itself and its inconsistent enforcement of its own

safety system. But the Eighth Circuit has concluded that more is required

to show an indifference to the safety of the workplace.

## ARGUMENT

## I.    Standard of Review

This Court has jurisdiction over the petition under 29 U.S.C. § 660.

This Court applies the same standard of review to the final decision as it

would if the Commission had directly issued its own decision. *See Echo*

*Powerline, LLC v. OSHRC*, 968 F.3d 471, 476 (8th Cir. 2020). The Court

accepts the ALJ's findings of fact so long as they are supported by

substantial evidence on the record considered as a whole, and reviews the

ALJ's legal conclusions to determine whether they are arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with the law. *Id.* The

Court need not afford the Commission any deference with regard to

ambiguous regulations because it is a neutral arbiter between the Secretary

of Labor and cited employers and, therefore, is not interpreting its own

regulations. *See New River Electrical Corp. v. OSHRC*, 25 F.4th 213, 219 (4th Cir. 2022). Thus, legal conclusions are reviewed *de novo. Id.*

**II.   The ALJ's decision is not in accordance with the law because OSHA has failed to give proper notice that its regulations would govern walking and working on top of railcars.**

In general, "an employer cannot be held in violation of the Act if it fails to receive prior fair notice of the conduct required of it." *Erickson Air-Crane, Inc.*, 2012 CCH OSHD ¶ 33199, 2012 WL 762001 at *3 (No. 07-0645, 2012). In this case, West Central should not have been cited for the use of fall protection during Umstattd's railcar loadout because OSHA has failed to provide fair notice that his work fell under the Secretary's regulations.

The Secretary has acknowledged that fall protection for walking and working surfaces atop railcars falls under FRA's regulatory purview. The Miles Memorandum generally stated that OSHA should not regulate workers atop railcars either under its Subpart D regulations for walking-working surfaces, or its Subpart I regulations for the use of PPE, with one vague exception. OSHA subsequently and repeatedly considered issuing rules to address the Miles Memorandum's admitted lack of "clear direction to the public or to OSHA's field staff," but has never done so.

The ALJ below concluded that the Miles Memorandum has provided fair notice for the past 30 years of OSHA's enforcement policy with regard to fall hazards from atop rolling stock. ADD-17. But the ALJ's conclusion ignores explicit acknowledgments from the Secretary and the OSHRC that there is confusion about the policy articulated in the Miles Memorandum.

In his 1996 memorandum, Director Miles took the position that OSHA staff should not issue citations for workers atop railcars under Subpart D or Subpart I, except when, in the judgment of the compliance officer, the "installation of fall protection is feasible" under Subpart I. A-185 (A.R. Vol. 4, Ex. J-1). This exception, contained in an internal memorandum rather than articulated through normal rulemaking processes, fails to provide the kind of fair notice that West Central is entitled to receive.

In this case, the Miles Memorandum's vague "feasibility" exception also produces an absurd situation where Umstaddt's conduct is considered a violation when he works on some railcars without fall protection, but it is not a violation when he works on other adjacent railcars without fall protection.

Because West Central did not have fair notice of its duty to use fall protection equipment, the citation should be vacated.

**A.** **The Miles Memorandum does not provide fair notice of OSHA's enforcement policy for fall hazards from atop rolling stock.**

The Miles Memorandum provides no clear basis upon which a violation can be imposed on West Central, much less a willful one. By the Secretary's own admission, the Miles Memorandum was unclear and generated varied interpretations. Indeed, the OSHRC has vacated similar PPE citations related to fall protection because the broad exemption of all rolling stock from fall protection standards, limited only by a narrow and vague exception in the Miles Memorandum, fails to provide the required notice. The same outcome is proper in this case.

The ALJ below concluded that West Central had fair notice because the existence of the I-beam fall-protection structure at the Adrian facility indicated there was an "objectively foreseeable" fall hazard and, therefore, West Central should have foreseen that it had to ensure employees actually used that fall protection system. ADD-17. But the ALJ unfairly and incorrectly focuses on the foreseeability of a fall hazard rather than fair notice of whether a fall hazard is governed by OSHA regulations.

The Secretary has actually conceded that "[t]he [Miles] memorandum did not result in clear direction to the public or to OSHA's field staff." 75 FR 28862-01 at 28867, Walking-Working Surfaces and Personal Protective Equipment (Fall Protection Systems). After reopening the rulemaking record in 2003, OSHA found that "the understanding of the [Miles Memorandum] also varied among commenters" who were responding to requests for information on the feasibility of fall protection for rolling stock. *Id.*

The regulatory history that followed the Miles Memorandum confirms the Secretary's assessment that it does not provide clear notice to employers regarding when, if ever, OSHA will issue citations related to fall hazards from atop rolling stock. On March 4, 2002, OSHA promised it would provide clarity for workers atop rolling stock in a "compliance directive" that never came. *See* Occupational Safety and Health Administration, Archived Standard Interpretation, 29 C.F.R. § 1910(a): Fall protection requirements for commercial motor vehicles (Mar. 4, 2002), https://www.osha.gov/laws-regs/standardinterpretations/2002-03-04-1.

In May 2003, OSHA engaged in new fall protection rulemaking under Subpart D and for PPE, but it failed to address the confusion

regarding workers atop railcars. In its commentary, OSHA described the Miles Memorandum as an interim document, having been issued "in anticipation of a final revised rule." *See* Walking and Working Surfaces; Personal Protective Equipment (Fall Protection Systems), 68 Fed. Reg. 23528-01 (May 2, 2003). But no final revised rule has ever been issued articulating the vague exception introduced in the Miles Memorandum and relied upon by the Secretary in this case.

Considering this regulatory history, the OSHRC has already vacated citations issued under this same PPE exception from the Miles Memorandum as lacking fair notice. In *Erickson Air-Crane*, OSHA cited an employer that had allegedly failed to adhere to its own work policy that could have abated a fall hazard, similar to the citation at issue here. *Erickson Air-Crane, Inc.*, 2012 WL 762001 at *2. The Secretary claimed that the employer had fair notice of the regulation because of the same provision in the Miles Memorandum that requires PPE "where installation of fall protection is feasible." *Id.*, 2012 WL 762001 at *4. But the OSHRC disagreed, vacating the citation because the Miles Memorandum did not provide fair notice. *Id.*

The same outcome is required here. Because the Miles Memorandum did not provide West Central with fair notice of the circumstances in which OSHA would issue citations for failure to use a fall protection system, the citation in this case should be vacated.

**B.** **West Central did not have fair notice that OSHA would regulate fall hazards under § 1910.132 because more recent regulation of fall-hazard systems declined to adopt requirements for rolling stock.**

A second reason that West Central did not have fair notice that the General PPE requirements under 29 C.F.R. § 1910.132 would apply to its railcar loadouts is that newer and more specific walking-working fall-protection standards are found within 29 C.F.R. § 1910.140 — a regulation that excluded any requirements for rolling stock.

On January 17, 2017, 29 C.F.R. § 1910.140[4] became the effective requirements for fall protection in general industry, establishing "performance, care, and use criteria for all personal fall protection

_____

[4] Prior to the adoption of § 1910.140 in 2017, there was no express mention of fall protection in Subpart I for PPE. In prior rulemaking, OSHA had specifically addressed a variety of other PPE: Eye and face protection (§ 1910.133); Respiratory protection (§ 1910.134); Head protection (§ 1910.135); Foot protection (§ 1910.136); Electrical protective equipment (§ 1910.137); and Hand protection (§ 1910.138). Thus, no specific rules regarding PPE "fall protection" existed until promulgation of § 1910.140.

systems." 29 C.F.R. § 1910.140(a). OSHA chose not to cite this fall-protection standard (in place for six years at the time of the citation in this case) when it concluded that West Central failed to utilize its fall protection system during railcar loadouts. Instead, it based its citation on the "general requirements" of § 1910.132, under an exception found in the Miles Memorandum.

By choosing the general requirements of § 1910.132, the Secretary was required "to prove that the need for employees to be provided and use particular PPE was objectively foreseeable." *Perez v. Loren Cook Co.*, 803 F.3d 935, 940 (8th Cir. 2015) (citing *Arkansas-Best Freight Sys., Inc. v. OSHRC*, 529 F.2d 649, 655 (8th Cir. 1976)). Given the specificity of § 1910.140 as compared to the vagaries of the Miles Memorandum, the Secretary should have cited West Central—if any violation could have been found—under the newer standard targeted at PPE fall protection.

Part 1910 of the Occupational Safety and Health Standards provides that "[i]f a particular standard is specifically applicable to a condition, practice, means, method, operation, or process, it shall prevail over any different general standard which might otherwise be applicable to the same condition, practice, means, method, operation, or process." 29 C.F.R. §

1910.5(c)(1). Under this standard, the 2017 regulation covering "performance, care, and use criteria for all personal fall protection systems" should have applied to West Central's use of its own fall protection system rather than the broader PPE standard.

Four years ago, an ALJ vacated a similar fall protection citation for this very reason in *Fabarc Steel Supply, Inc., Respondent.,* 2019 CCH OSHD. ¶ 33753, 2019 WL 4786889 (No. 18-1859, Aug. 20, 2019). In *Fabarc,* the ALJ acknowledged that § 1910.140 had superseded existing fall protection standards and vacated a fall protection citation because the Secretary used the more general standard in § 1910.132 rather than amending the citation under the new standard. *Id.*[5]

In the present case, the issue is not simply that a more specific regulation outlines a new standard for conduct, but that after nearly three decades of OSHA contemplating a rule to regulate workers atop railcars, the new standards for walking-working surfaces declined to propose any

---

[5] In *Fabarc,* the ALJ also noted that the general standard in § 1910.132 is premised on the completion of a specific hazard assessment by the employer. *Id.* As West Central pointed out below, no such hazard assessment has been identified in this case. However, the ALJ assumed that, because a fall protection system was installed, some hazard assessment must have occurred. ADD-13.

specific requirements for fall protection from rolling stock. *See* 81 Fed. Reg. at 82509.

The ALJ concluded below that, because the Final Rule did not propose requirements for rolling stock, it "did not change OSHA's enforcement policy of citing under § 1910.132 fall hazards present on rolling stock if the rolling stock was adjacent to a structure where fall protection was feasible." ADD-19. The ALJ failed to recognize that the enforcement policy, tucked away as an exception to an internal memo, was not a result of fair notice.

The OSHRC has acknowledged elsewhere that an internal agency memorandum, like the Miles Memorandum, is not a proper instrument to announce an expansion of the applicability of certain OSHA standards. *See Davey Tree Expert Co. & Its Successors, Respondent*, No. 11-2556, 2013 WL 11263360, at *50 (CMPAU July 1, 2013). OSHA's promulgated rules, such as the fall-protection standards issued in 2016's Final Rule, should address such concerns rather than require employers to rely on a narrow and confusing exception in a 30-year-old internal memorandum.

In *Davey Tree*, the Secretary set forth seven factors in a memorandum titled "Directive 45" to help determine whether logging safety regulations

should apply to non-logging "tree care" companies. The ALJ held that, despite these specific factors, Directive 45 (issued by the Secretary, not an underlying Director) was "not a proper instrument to announce an expansion of the applicability of the logging standard to the line clearing industry without engaging in Notice and Comment rulemaking as required by the APA." *Id.* The same outcome is proper in this case.

Because the Secretary has failed to provide any clear fall protection standards for rolling stock in § 1910.140, the 30-year-old Miles Memorandum does not provide fair notice that fall protection citations will still be issued under § 1910.132.

**C.  West Central did not have fair notice that OSHA would issue citations under § 1910.132 because the majority of railcar loadout work occurred outside the fall protection system and, therefore, outside the scope of the PPE standard.**

The Miles Memorandum provides that it would not be appropriate for OSHA to cite employers for fall hazards atop rolling stock under the PPE standards unless the employees are working next to a building or structure where the installation of fall protection is "feasible." A-185 (A.R. Vol. 4, Ex. J-1). But the Miles Memorandum provides no guidance on when such protection is or is not feasible.

OSHA's citation in this case assumed that the existence of West Central's I-beam structure established "feasibility," but because much of Umstattd's work atop railcars occurred outside the I-beam structure, West Central had no fair notice that Umstattd's failure to use fall protection would constitute a violation on some cars but not others.

The facts below indicate that, on busy days, as many as 20 railcars were lined up on the track to be loaded, most of which were outside the three-to-four-car reach of West Central's I-beam structure. When Umstattd finished opening lids on the railcars within the I-beam structure, he would step across to the next railcar and repeat the process for each car down the line—something that he could not continue to do down the line while wearing the fall protection system.

West Central testified that it had a general understanding that fall protection was not required by regulations outside the I-beam structure. ADD-09; A-178 (A.R. Vol. 3 at 776 – 77). This was a view apparently shared by OSHA, which based its determination of "feasibility" on the mere existence of the I-beam structure. A-153 (A.R. Vol. 3 at 677-78). OSHA has not suggested that it was feasible for additional fall protection outside of the existing structure, and there is no suggestion that Umstattd's work atop

other cars outside the I-beam structure would have been a violation of the PPE standard—that work would have fallen outside the "feasibility" exception relied upon in this case.

The lack of fair notice in this case is highlighted by OSHA's uneven application of the Miles Memorandum's "feasible" PPE exception. For example, if West Central had 20 railcars lined up for loadout, OSHA considers it a willful violation for Umstattd to work on railcars 1 through 4 without fall protection, but not a violation of any kind for Umstattd to walk atop railcars 5 through 20. This is not a clear or reasonable standard, particularly where the cars were stationary rather than moving. "Standards under the Act should be given a reasonable, commonsense interpretation." *Jacobs Field Servs. N. Am., Inc. v. Scalia*, 960 F.3d 1027, 1033 (8th Cir. 2020).

This appeal is about the fair notice given to West Central, which is entitled to a constitutional right to due process. The ALJ acknowledged below that "[t]he touchstone for sufficiency of notice under the due process clause is reasonableness." ADD-17 (citing *Wal-Mart Distrib. Cntr. #6016 v. Occupational Safety and Health Review Comm'n*, 819 F.3d 200, 205 (5th Cir. 2016)). But it is unreasonable for West Central to have expected Umstattd's

conduct atop one stationary car would be a violation when the same conduct atop the next stationary car would not.[6]

Because West Central did not have fair notice that the conduct in question would be cited as a violation of PPE standards, the citation should be vacated.

**III.    The ALJ's decision is not in accordance with the law because the record does not show that MFA "willfully" violated fall protection standards.**

Even if the Court does not vacate the citation in full, the ALJ's conclusion that West Central's conduct constituted a willful violation of OSHA standards should be reversed and the penalty should be reduced.

A "willful" violation is not defined anywhere in the OSH Act and the legislative history on the term is "sketchy." *St Joe Mins. Corp. v. Occupational Safety & Health Rev. Comm'n*, 647 F.2d 840, 845 (8th Cir. 1981).

---

[6] If OSHA seeks the Court's deference to the Miles Memorandum, the Court should decline. *See Perez v. Loren Cook Co.*, 803 F.3d 935, 940 (8th Cir. 2015) (DOL's interpretation is not conclusive or binding on the court; deference is due only if, among other things, the interpretation is the result of "thorough and reasoned consideration." Otherwise, the resulting enforcement is unfair surprise.)

The employer's state of mind is the key inquiry on the issue of willfulness. *See Propellex Corp.*, 18 BNA OSHC 1677, 1684 (No. 96-0265, 1996).

To prove West Central willfully violated Subpart I, the Secretary must show that West Central "intentionally disregarded or was plainly indifferent to the requirements of the Act." *See United States v. DNRB, Inc.*, 895 F.3d 1063, 1067 (8th Cir. 2018); *Valdak Corp. v. OSHA*, 73 F.3d 1466, 1468 (8th Cir. 1996). Likewise, the OSHRC has held that a violation is willful if the employer's state of mind at the time of the violation reflects intentional disregard or plain indifference to either the requirements of the Act or employee safety. *Home Rubber Co., Lp*, 2021 CCH OSHD ¶ 33,853 (No. 17-0138, 2021). The record does not support either intentional disregard or plain indifference to the requirements of Subpart I under the exception contained in the Miles Memorandum.

**A. The ALJ acknowledged there was no proof of intentional disregard and the record does not support the ALJ's supposition about plain indifference.**

West Central did not intentionally disregard Subpart I. The ALJ found the Secretary failed to establish that West Central was actually aware, at the time of the violation, that the act was unlawful. ADD-24. Notwithstanding West Central's measures to address a fall hazard from

atop its railcars, such as an I-beam structure, regular safety trainings, the SHIELD BBS program, and the use of stationary railcars during grain loading, there was no evidence that West Central was aware that a failure to employ such measures would be a violation of OSHA regulations.

Consistent with the ALJ's finding that West Central was not aware that its acts were unlawful, the ALJ did not find — and the Secretary did not show — a "heightened awareness of the *violative nature* of its conduct." *MJP Constr. Co.*, 19 BNA OSHC 1638, 1647 (No. 98-0502, 2001) (emphasis added). West Central did not knowingly violate Subpart I.

To prove West Central acted willfully due to its "plain indifference," the Secretary had to present evidence sufficient to prove that West Central possessed a state of mind "such that if it were informed of the standard, it would not care." *AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 74 (D.C. Cir. 2004).

To engage in this supposition of indifference, the ALJ first found that West Central possessed a "heightened awareness of the conditions at its workplace." *MJP Constr. Co.*, 19 BNA OSHC at 1647. The ALJ made this finding even though there was no evidence that any falls or injuries ever occurred from work atop railcars at the Adrian facility. Further, contrary to

what is often the case in findings of willfulness, OSHA never previously cited West Central under Subpart I. Past violations of similar, but not necessarily identical, regulatory provisions may show willfulness. *See Western Waterproofing Co. v. Marshall,* 576 F.2d 139, 145 (8th Cir. 1978).

The ALJ found that West Central was aware of some work that occurred atop railcars without the use of the fall protection system. But the record is not clear on how much of that work occurred under the I-beams — which supposedly fell under OSHA's regulation — versus how much occurred outside the I-beams — which was not subject to citation under OSHA's regulation. The record is equally unclear on whether the railcars at issue were stationary.

The Eighth Circuit has made clear that knowledge of a hazard coupled with imperfect enforcement of safety measures is not enough to support a willful citation. Instead, the Secretary must establish evidence, "apart from that establishing knowledge of the hazard, from which we may reasonably conclude that the employer intentionally disregarded or was indifferent to the safety of the workplace." *St. Joe Mins. Corp v. OSHRC,* 647 F.2d 840, 848-49 (8th Cir. 1981). It does not matter if, in hindsight, "some risk remained." *Id.*

This evidence does not support the supposition that West Central would not have cared if it knew such incidents violated Subpart I. Had West Central not cared, it would not have built the I-beam structure, conducted trainings, kept railcars stationary, or taken other precautions against falls from railcars. OSHA and the ALJ not only ignored the potential positive import of those measures, but focused only on instances of non-compliance. There is no evidence, however, that had OSHA informed West Central that work atop railcars (under the I-beam structure) must always involve use of a harness, even if the railcar was stationary, West Central "would not care." Indeed, it appears that, had West Central not installed a fall-protection system *at all*, OSHA would not have cited it for a violation in the first place.

Because the violative nature of Umstattd's failure to use the fall protection system was not clear, and because the evidence did not demonstrate a general disregard or indifference to safety in the workplace, the citation should not have been upheld as a "willful" violation.

**B.    West Central's other safety precautions should have been considered "good faith" that mitigates against a "willful" violation.**

The regulatory history of OSHA's decision to not regulate fall protection hazards demonstrates that there are other effective measures—apart from conventional fall protection line and cable systems—that can protect workers on rolling stock. Among these effective measures were initial, periodic, and remedial training, loading/unloading trailers from the ground (*e.g.*, bottom-loading tankers, ground-level controls) and prohibiting workers from being on moving rolling stock. *See* 81 Fed. Reg. at 82506.

West Central presented evidence that such measures were in place at the Adrian facility, reducing the risk of falls even in the absence of the fall protection system. West Central told employees not to work atop moving railcars. A-80 (A.R. Vol. 1 at 113); A-120 (A.R. Vol. 1 at 271); A-170 (A.R. Vol. 3 at 746). It had training programs for its employees and a peer-to-peer behavioral-based safety program. Most importantly, work atop the railcars occurred while they were stationary rather than on moving rolling stock.

It is well established that a violation is not willful if an employer can show that it exhibited a good faith, reasonable belief that its conduct

conformed to the law. *Jim Boyd Constr., Inc.*, No. 11-2559, 2016 WL 8201805, at *3 (OSHRC, Nov. 16, 2016.) Considering the regulatory history of OSHA standards—or rather, lack of standards—for fall protection from rolling stock, West Central had the good faith and reasonable belief that its efforts did conform to the law, notwithstanding the imperfect enforcement of its fall protection system.

Efforts to make its workplace safe may show that an offense was not willful. *See Dakota Underground, Inc. v. Sec'y of Lab.*, 200 F.3d 564, 569 (8th Cir. 2000). In issuing the Citation, however, OSHA did not even consider West Central's good faith efforts because of its erroneous belief that consideration of good faith was not permitted for violations it classified as willful. ADD-27 n.14. This was circular and arbitrary reasoning on OSHA's part.

"An employer is entitled to have a good faith opinion that his conduct conforms to regulatory requirements" and "such conduct should not be construed as constituting a willful violation of the [OSH] Act merely because Labor holds a contrary opinion on the facts and advises the employer of that opinion." *C.N. Flagg & Co., Inc.*, 2 BL OSHC 1539 (No. 1409, 1975). A willful violation must "be apparent at the time committed"

and a "violation is not willful when it is based on a nonfrivolous interpretation of OSHA's regulations." *McLaughlin v. Union Oil Co.,* 869 F.2d 1039, 1047 (7th Cir.1989).

Good faith does not require perfection. As the D.C. Circuit explained in *Dayton Tire v. Sec'y of Lab.*, 671 F.3d 1249 (D.C. Cir. 2012), a failure to display "the kind of initiative we would expect when lives and limbs are at stake" does not equate to a state of mind where the employer "would not care" even if informed of the standard. *Id.* at 1257. There, the employer "made *some* effort to ensure Dayton's LOTO compliance, and under these circumstances, some effort is enough to save Dayton from a willfulness determination." *Id*.

This is not a case where the employer insisted that employees work in unsafe conditions. OSHA concedes that work atop railcars may take place without fall protection, with its feasibility and other mitigating safety measures left to the employer. Because West Central had the good faith belief that its efforts did conform to the regulations, the citation should not have been upheld as a "willful" violation under the opaque Miles Memorandum.

# CONCLUSION

Because the ALJ's decision is not in accordance with the law, MFA

respectfully requests that the Court grant the petition, reverse the

Commission's order, and vacate OSHA's June 21, 2021, citation that MFA

willfully violated § 1910.132(d)(1)(i) for failure to require employees to

wear personal protective equipment while performing railcar loadout.


**LATHROP GPM LLP**

By   /s/ Richard C. Landon
    Richard C. Landon (#392306)
3100 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: 612.632.3000
richard.landon@lathropgpm.com

and

Tedrick A. Housh III
Ellen Rudolph
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: 816.460.5642
Tedrick.House@lathropgpm.com

*ATTORNEYS FOR PETITIONER MFA
ENTERPRISES INC. d/b/a WEST CENTRAL
AGRI SERVICES*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I verify that this brief contains 7,663 words, exclusive of those parts of the brief exempted by Fed. R. App. P. 32(f). The brief has been prepared in proportionally spaced typeface using Microsoft® Word for Microsoft 365 and 14-point Book Antiqua type.

　　　/s/Richard C. Landon　
Richard C. Landon

65045821v6